## Merrill R. Skinner, Plff. in Err., v. David McAllister.

If land is seated when assessed and sold for taxes as unseated land, the sale is void.

If land is seated when assessed, after the collector's return it is the commissioner's duty to cause it to be sold as seated.

When a jury is misled by the charge of the court, the verdict will be reversed.

(Decided October 4, 1886.)

Error to the Common Pleas of Erie County to review a judgment on a verdict for defendant in an action of ejectment. Reversed.

The facts of the case as they appeared in the court below are sufficiently stated in the charge to the jury by GALBRAITH, P. J.:

Gentlemen of the Jury:

The plaintiff claims to be the owner and entitled to the possession of the land described in the writ in this case, which land is in the occupancy of the defendant, David McAllister, who claims, on the other hand, that he is the lawful owner, and entitled to remain in possession as such.

The evidence shows that this land was originally owned by Mr. Huidecooper, who, on the 13th of July, 1853, agreed to sell it to Isaac Babbitt by article. Babbitt thus became the owner of the equitable title, and entitled to a deed of the same from Mr. Huidecooper when he had paid for it.

For the purposes of this case, Babbitt may be treated as the legal owner at the time he took possession under the purchase by him for Mr. Huidecooper. On the 3d of January, 1857, Isaac Babbitt assigned his article, the article between him and Huidecooper, to Lucy B. Lillie, who by her will devised the land to Juliette Irene Babbitt, the devise being conditioned, but for our present purpose to be treated as an absolute devise, as the question of law arising upon this condition will be reserved for argument and decision hereafter, in case you should find for the plaintiff.

The whole case rests, as you will perceive, upon the validity

of the treasurer's title acquired by Caleb Thompson under the deeds executed to him by the county treasurer in 1862.

It is claimed on part of the plaintiff that the land was not the subject of sale by the treasurer, and that the sale was therefore void, and that no title therefor vested in Caleb Thompson, and that the defendant, in consequence, had no ownership.

Your close attention must be given to the rule of law governing treasurers' sales, as well as the evidence on part of the plaintiff and defendant as to the question as to the character of the land in dispute; that is, whether seated or unseated, and whether it became unseated by abandonment after having been seated. If the land was actually seated in 1860, that being the year for the tax of which the land was sold, then the sale by the treasurer would be void; and the sale by the treasurer would give no title, and the case for the plaintiff must fail.

Lucy B. Lillie died in 1884. The claim of the plaintiff, as you see, rests, upon the one hand, upon the title acquired of Babbitt from Huidecooper and by him assigned to Lucy B. Lillie and by her devised to Juliette I. Babbitt, to whose rights the plaintiff succeeded by his marriage to her.

The claim of the defendant, David McAllister, to the ownership of the land rests upon two deeds of the treasurer of Erie county, by which the land in controversy was conveyed to Caleb Thompson, who bought it at treasurer's sale for taxes, in 1862. Thompson died in 1863, having made his will by which he empowered his executors, C. L. Thompson and David Wilson, to sell and convey any land which he was seised, by deed dated. The executors, C. L. Thompson and David Wilson, conveyed the land to the defendant, David McAllister, who went upon the land and still occupies it.

That the land became seated after Babbitt's purchase is shown by the evidence. It is not a fact in dispute. There was a small clearing, a dwelling house was put up, and a log stable; and there was some ground cultivated and some crops raised. Babbitt resided on the place from 1854 until 1856, when he moved away, and the place was unoccupied until 1859, when Calvin Snow went into the house and, according to some of the evidence, was there until the following winter; that would be the winter of 1859 or the spring of 1860. There is some evidence that he was there later than the spring of 1860, but about that there is controversy. There is a good deal of controversy as to the length

of time that Snow was there, some of the witnesses putting it a very short time and others having him there from some time in 1859 until the following winter.

In 1860 the collector of the township made return to the commissioners of the county that the land was unseated, and that there was no personal property on the premises out of which the taxes could be collected. The book kept in the commissioner's office shows that the land was put on the unseated list and so reported to the treasurer, and he proceeded in due time to sell the same as unseated land.

Now, the whole case narrows down to this sale, as I view it; and it involves questions of fact which are for you. As I have already stated, the uncontroverted evidence shows that the land was on the seated list, and was seated land after the possession of Babbitt commenced, say in 1854. It remained seated, for all legal purposes, unless its character was changed in one of two ways: Either by its being put on the unseated list of the assessor, or by its being abandoned by the owner and becoming actually unseated again. That it was not put on the unseated list by the assessor appears from the evidence, or, at least, there is no evidence that the assessor did put it on the unseated list; but it it claimed that the collector—and that is shown to be a fact—made return that the land was unseated, and that there was no personal property out of which he could make the tax, and that the commissioners then put it on the unseated list in their office, and the treasurer then proceeded to sell it.

You are instructed, as a matter of law, that that proceeding was a mere nullity, unless the land was actually unseated, unless it had become so. The collector could not by returning it unseated, and the commissioners by putting it on the unseated book, make this sale anything but a void sale if the land was actually seated. There had been cultivation there, and building there, and the remnants of a barn; [but if the land had been abandoned by the owner so that it became again unseated, then this action of the collector in returning it to the commissioners and the commissioners to the treasurer, then the sale would assume an entirely different phase and the sale made under these circumstances, the land having lapsed into its original unseated state by the abandonment,—if you find that fact,—the sale would be good and vest the title in the purchaser, without notice.]

[There is no evidence of any notice having been given to the owner; and the commissioners could not by their act give this the character of unseated land without notice to the owner, unless you find that, in point of fact, the owner had abandoned this property and left it for such time as will satisfy the minds of the jury that he intended to leave and abandon it permanently, thus avoiding personal liability for the tax.]

Now you see this presents a question with which the court has nothing to do; it is a question entirely for you; it is for the judge to endeavor to give you, as best he can, the law as bearing on this, which is that, where property has once become seated, the presumption is that it remains seated; and by seated land we mean that kind of permanent occupancy or possession, with the means afforded thereon for the collection of taxes. There may be cultivation without residence, or residence without cultivation; either will give the land the character of seated land. The main purpose of the law is that there shall be something on the land to collect taxes from, but that is not indispensable; if the land is occupied either for cultivation or residence, so that it shows an intention to reclaim it from its wild condition, that is seated land,—whether it is for manufacturing, cutting lumber, or anything else that shows that it is to be occupied.

But, having become seated, it may again become unseated by the act of the owner in giving it up, in leaving it and going away and abandoning it and showing an intention not to continue his occupancy.

The evidence is that Mr. Babbitt left in 1856. The sale may be taken into consideration in connection with the abandonment; that the sale didn't take place from him to Mrs. Lillie until 1857, which was the following year, so that it wouldn't have so much bearing on his going away as though it had been contemporaneous with the leaving.

Now it is alleged on part of the plaintiff that, even if this property was left in this way, it was again occupied by Mr. Snow, and that his occupancy would stop the operation of this abandonment, and restore its quality of seated land. That depends upon all the circumstances, and these are for your consideration. The mere temporary occupancy of land for a temporary purpose, by a person not pretending to have any claim to the land and having no intention of making himself liable for the taxes, would not give a seated character to the land, if the

jury believe from the evidence that it had been abandoned by the owner.· The mere camping out, or the mere temporary use of an abandoned building, would not be sufficient; but, if a man went in there, even as an intruder, and had property, and with the intention of making it a residence remained some time, and had property there in the very year, sufficient out of which the tax might be made,· it would be different.

[It is for you to judge. It is impossible to make a rule that will apply to each case, because there is such a variety of circumstances. It is for the jury to use their common sense and determine, under the rule we have given you, whether this was an abandonment by Babbitt, or whether, he having abandoned it (if you find he did), Mr. Snow went there in such a way as to change that and restore its character of seated land, or prevent the operation of the abandonment, so that it was seated in 1860.]

Was Snow living there with a view of making it his residence for anything more than a casual and temporary purpose; or was he there, although an intruder,—there is nothing to show that he went in under anyone,—with the intention of residing for some time? He stayed, it seems, for a number of months. Was he making it his residence, or was it a mere camping out and temporary shelter, and did he have property there out of which the tax could be made? If he was living there and making it his residence it would make him liable for the tax, and in that way the land would become seated again. That is entirely for you.

Now, if this property was seated, either from Babbitt not having abandoned it and the character of seated property continuing to adhere to it as given by him in 1854, or if Snow went in there and made it his residence, with property there out of which the tax could have been collected in 1860,—then the sale by the treasurer, notwithstanding the fact of its having been put on the unseated book, would be void; [but if you find that Babbitt really had. abandoned it and gone away without any intention of returning, and the place growing up to briars and the house tumbling down, and the barn, originally a flimsy structure, in ruins, not fit for occupancy for any purpose for which it was intended, and you find that the occupancy of Snow was merely temporary and casual, without the intention of making it his residence, then this property was unseated, and then the collector did right in making the return that he did, and the commissioners had a

right to put it on the unseated book, and the treasurer had a right to sell, and Mr. Thompson would acquire a title, and his title would be good; the time having elapsed without the property having been redeemed.] Mere irregularities about a treasurer's sale are cured by the act of 1815, but the act of 1815 doesn't cure the fact that this property was seated,—if you find that it was seated under the rules we have given you.

Now, the whole case hinges upon your finding upon this question of fact; what else remains to be said to you is included in the points. One of these points, the last one put by Mr. Sproul, involves a question of law which (by understanding upon both sides) will be reserved in the shape of a special verdict; so that, if you find for the plaintiff, you will find this additional special verdict, which will raise and bring before the court the legal question which was argued last night, as to whether Juliette I. Babbitt ever acquired any title at all; there being no proof here that this forfeiture occurred by which she would, under this devise, become the owner. But you have nothing to do with that; the whole question for you is whether this was unseated or seated, and whether abandoned or not.

The jury rendered a verdict for defendant, upon which judgment was entered; and plaintiff took this writ, assigning as error the portions of the charge of the court embraced in brackets, also the answer of the court to the plaintiffs' first point, which point and answer were as follows:

1. "That the testimony in the case shows that the land in dispute was assessed as seated, and therefore there could be no transfer of it by the collector, or the county commissioners, from the seated to the unseated list, and the sale by the treasurer, June, 1862, of the land as unseated, to Caleb Thompson, passed no title."

A. "The evidence shows that the land in dispute was unseated prior and up to the time of its purchase by Isaac Babbitt from H. J. Huidecooper in 1853; that after that time the land was assessed to Isaac Babbitt, among the seated lands, up to and including the year 1860; that in 1860 the land was returned by the collector as unseated, and put upon the list of unseated lands in the commissioners' office; and, the tax remaining unpaid, the land was sold by the county treasurer on June 9, 1862. Whether the sale passed the title to Caleb Thompson, the purchaser at

treasurer's sale, will depend upon the view the jury may take of the case under the evidence, and the point is refused.

*Elijah Babbitt, E. L. Whittelsey,* and *Henry Souther,* for plaintiff in error.—The payment of taxes, or the possession, did not help the title. This can only be done to help out the statute of limitations, as was done in M'Call v. Neely, 3 Watts, 69.

In case of unseated land where the taxes were paid for thirty years, and no taxes paid or other acts of ownership exercised by the adverse claimant, it was held to be equivalent to the running of the statute of limitations in favor of the payor. Sergeant, Land Law, 223; Read v. Goodyear, 17 Serg. & R. 350.

A tract of land ceases to be unseated as soon as it is actually occupied with a view to permanent use; and that occupation may be said to commence with the moment of entry for the purpose of clearing the land. Campbell v. Wilson, 1 Watts, 503; Wallace v. Scott, 7 Watts & S. 248; Milliken v. Benedict, 8 Pa. 169; Kennedy v. Daily, 6 Watts, 269; Harbeson v. Jack, 2 Watts, 124; George v. Messinger, 73 Pa. 418; Jackson v. Stoetzel, 87 Pa. 302; Earley v. Euwer, 102 Pa. 338; Stoetzel v. Jackson, 15 W. N. C. 260.

The intention of Snow had nothing to do with making the character of the land either scated or unseated. It was a fact that he lived upon the premises with his family, and had sufficient personal property there out of which the taxes could be collected. There had been a cultivation of the land so as to make it seated. George v. Messinger, 73 Pa. 418; Stoetzel v. Jackson, 15 W. N. C. 260; Sheaffer v. M'Kabe, 2 Watts, 421; Rosenburger v. Schull, 7 Watts, 390; Jackson v. Sassaman, 29 Pa. 106.

*J. W. Sproul,* for defendant in error.—The court left to the jury the question whether this land was seated or unseated at the time of the assessment. This was proper under the authority of Altemose v. Hufsmith, 45 Pa. 121; Rosenburger v. Schull, 7 Watts, 390; Watson v. Davidson, 87 Pa. 270.

The facts on which it is claimed that land is seated, and the extent and character of any alleged occupancy, are for the jury. Watson v. Davidson, 87 Pa. 270; Lackawanna Iron & Coal Co. v. Fales, 55 Pa. 94.

If Snow was on the land in 1860, he was there as an intruder

or trespasser. There is no evidence that he entered as an owner, or under anyone claiming as owner. Jackson v. Stoetzel, 87 Pa. 306.

Under the act of April 12, 1842, "all records of the county commissioners charging lands as unseated with arrears of taxes shall be evidence of an assessment."

But suppose the land was assessed on the seated list for 1860, but its character undesignated, and the land was actually unseated, and the collector so returned it, and the commissioners then put it on the unseated list charged with this tax, and the commissioners certified it to the treasurer, who sold it as unseated for the taxes; then we say the sale was regular and the purchaser took title. Laird v. Hiester, 24 Pa. 452; Arthurs v. Smathers, 38 Pa. 40; Alby v. Kennedy, 9 Pittsb. L. J. 356. See also Owens v. Vanhook, 3 Watts, 260; Frick v. Sterrett, 4 Watts & S. 269; Bechdle v. Lingle, 66 Pa. 41.

If there was any irregularity in the assessment, it was cured by the act of March 13, 1815, § 4, which provides, *inter alia:* "And that no alleged irregularity in the assessment or in the process, or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal." Hubley v. Keyser, 2 Penr. & W. 502; Hess v. Herrington, 73 Pa. 446; McReynolds v. Longenberger, 75 Pa. 13.

This is ejectment by the original title against the tax title, commenced October 27, 1875, more than thirteen years after the tax sale, during all of which time the purchaser at the tax sale was in actual possession of the land. The suit is barred by the statute of limitations of April 3, 1804, which enacts that "no action for recovering of said land shall lie, unless the same be brought within five years after the sale thereof for taxes, as aforesaid."

This limitation is in full force. Ash v. Ashton, 3 Watts & S. 510; M'Call v. Himebaugh, 4 Watts & S. 164; Bayard v. Inglis, 5 Watts & S. 465; Robb v. Bowen, 9 Pa. 71; Sheik v. McElroy, 20 Pa. 25–31; Burd v. Patterson, 22 Pa. 219; McReynolds v. Longenberger, 57 Pa. 29; Rogers v. Johnson, 67 Pa. 43.

OPINION BY MR. JUSTICE TRUNKEY:

It is somewhat difficult to ascertain from the paper books the mode of assessing unseated lands in Erie county. Not all the evidence has been printed; and defendant alleges that some of

the matter relating to the assessment is incorrectly printed. One thing is admitted, namely: The land was sold as unseated for the taxes of 1860; and the record shows no sale for the taxes of 1859. As the case comes it is necessary to notice only the instructions to the jury touching the assessment, on which depends the validity of the sale.

Babbitt had resided on the land, and it had been assessed to him as seated. The court told the jury that, after 1853, the land was assessed to Babbitt among the seated lands up to and including the year 1860, and that in that year the land was returned by the collector as unseated and put upon the list of unseated lands in the commissioners' office. And they were instructed that, unless the land had actually become unseated, the sale was a nullity; also that, if the land had been abandoned so long as to become again unseated, and the collector returned it to the commissioners as unseated, and they made the proper entry thereof in the unseated land book, the sale was valid.

It was clear that the land was assessed, either as seated or unseated, for the year 1860; that the rate had been fixed, the amount of tax ascertained, and the same put into the hands of the collector. From the peculiar method of keeping the books it may be impossible to ascertain how it was assessed; but it was assessed with the other lands in the township. That assessment was made in the fall of 1859, or early in 1860. If it was assessed as seated, then the jury were rightly told that, "if Snow went in there and made it his residence, with property there out of which the tax could have been collected in 1860, then the sale by the treasurer, notwithstanding the fact that it had been put on the unseated book, was void." But if the land was assessed as unseated, although Snow resided on it in 1860, with personal property, what right had the collector to touch such property? If the officers choose to make it a land tax, without personal liability of the landowner, the personal property of the lessee, or of an intruder, could not be seized and sold in satisfaction of the tax.

It was incorrect to say to the jury, as set out in the fifth assignment, that, if the land was seated in 1860, and Snow was residing on it, his property was liable for the tax, in case it was assessed as unseated. The instruction, in connection with other parts of the charge, was that, if Snow went on the land in 1860, to reside permanently, his property was liable for the tax, even

if it had been assessed as unseated because of Babbitt's abandonment. And with the answer to the plaintiff's first point, the jury would understand that the point of time was December, 1860, to determine whether the land was seated at that date, instead of the date of assessment prior to fixing of the amount of tax.

If the land was seated when the assessment was made, the sale was void; if unseated, the sale was valid. If the assessor found Snow residing on the land in the fall of 1859, he had good reason not to change the assessment. In that case it matters not where Snow resided in the summer of 1860. If he moved away after the making of the assessment and laying of the tax, the collector and commissioners had no authority to change the tax for that year. Instead of so pointedly directing the minds of the jury to the time of the collector's return in December, 1860, the court should have directed their inquiry to the date of the assessment. Nor would it have been amiss to inform them that, if the land was seated when assessed, after the collector's return it was the commissioner's duty to cause it to be sold as seated.

Nearly all the rulings and instructions of the learned judge at the trial are unexceptionable. But we think the jury were misled on the matter indicated. It may or may not have affected their conclusion. Snow was assessed in that township for the years 1859 and 1860. It is not shown that he resided elsewhere than on this land; and had the jury been advised that the inquiry whether the land was seated must be with reference to the time of assessment, perhaps the verdict would have been the other way.

Judgment reversed and *venire facias de novo* awarded.